UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NANJING CIC INTERNATIONAL CO., LTD.,

                    Plaintiff,

      v.

JAMES SCHWARTZ and FOUNDRY
ASSOCIATES, INC.,

                  Defendants
_____

**DECISION AND ORDER**

6:20-CV-07031 EAW

## INTRODUCTION

Plaintiff Nanjing CIC International Co., Ltd. ("Plaintiff") commenced the instant action on December 3, 2020, asserting claims of breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, breach of fiduciary duty, and unjust enrichment against defendants Foundry Associates, Inc. ("Foundry") and its president James Schwartz ("Schwartz") (collectively "Defendants"). (Dkt. 1; *see* Dkt. 18-1 at ¶ 1). Currently pending before the Court are: (1) a motion for summary judgment filed by Defendants (Dkt. 18); and (2) a cross-motion for leave to amend filed by Plaintiff (Dkt. 29). For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment and denies Plaintiff's cross-motion for leave to amend.

## FACTUAL BACKGROUND

The following facts are taken from the complaint (Dkt. 1), Defendants' Statement of Material Facts submitted in support of their motion for summary judgment (Dkt. 21),

Plaintiff's response thereto (Dkt. 30), and the exhibits submitted by the parties.  The Court has noted relevant factual disputes.

Foundry is a New York corporation with its principal place of business in this District.  (Dkt. 21 at ¶ 1; Dkt. 30 at ¶ 1).  It is undisputed that Foundry "designs, engineers, and sells metal castings, as well as machined parts and various other products."  (Dkt. 21 at ¶ 2; Dkt. 30 at ¶ 2).  However, Plaintiff maintains that in its relationship with Foundry, "Foundry had a limited role in the design and engineering of the parts [Plaintiff] sold to its customers. . . .  Instead, [Plaintiff] worked directly with the customer to design and engineer the [products]. . . ."  (Dkt. 30 at ¶ 2).

Foundry represents that it has approximately 40 to 45 regular customers and approximately 250 occasional customers, all of whom are based in the United States.  (Dkt. 21 at ¶¶ 3-4).  Plaintiff does not controvert these representations but contends that it lacks information to respond to them due to a lack of discovery.  (Dkt. 30 at ¶¶ 3-4).

As a general matter, when one of Foundry's customers needs a new part manufactured in China, it will submit a request for quote to Foundry, and Foundry will deliver that request for quote and any other pertinent information to a trading company in China.  (Dkt. 21 at ¶¶ 5-6; Dkt. 30 at ¶¶ 5-6).  The trading company in China will then identify a suitable factory or foundry in China to manufacture a sample part, which will be delivered to Foundry for inspection and feedback.  (Dkt. 21 at ¶¶ 7-8).  If the customer approves the sample part, it then has the option of ordering directly from the trading company with Foundry receiving a commission.  (*Id*. at ¶ 9).  In the alternative, Foundry

may act as the purchaser and then resell the part to its customer in the United States.  (*Id.* at ¶ 10).

Plaintiff does not dispute that this is Foundry's general process.  However, Plaintiff contends that in its relationship with Foundry, "[Plaintiff's] customers typically placed orders directly with [Plaintiff]."  (Dkt. 30 at ¶¶ 5-6).  Plaintiff further contends that in its dealings with Foundry, it "routinely delivered sample parts directly to customers or potential customers for inspection and feedback and worked directly with those customers to make any required corrections or modifications."  (*Id.* at ¶ 8).

Foundry maintains that it has never entered into any agreement in which it would exclusively represent only a single trading company in China.  (Dkt. 21 at ¶ 11).  Plaintiff states that it "does not have sufficient information to address this statement" due to a lack of discovery.  (Dkt. 30 at ¶ 11).  However, in its complaint, Plaintiff alleges that it had a verbal contract with Defendants whereby they agreed to act as Plaintiff's exclusive agent in the United States.  (Dkt. 1 at ¶ 12).  Plaintiff contends that this "exclusive relationship" lasted for over 10 years and was "very clear to both parties in terms of commitments and actual operations."  (Dkt. 30 at ¶ 34).

Plaintiff is a trading company based in Nanjing, China.  (Dkt. 21 at ¶ 12; Dkt. 30 at ¶ 12).  The parties dispute the manner in which their relationship began.  Foundry claims that it first engaged in business with Plaintiff in 2003 in connection with a project for its longtime client Ingersoll Rand.  (Dkt. 21 at ¶ 13).  However, Plaintiff maintains that it began working with Foundry because it "realiz[ed] that it needed an agent in the U.S. to support its attempts to grow sales of [its] products in the U.S."  (Dkt. 30 at ¶ 13).  It is

undisputed that between 2003 and 2008, the parties' relationship grew to encompass at least 13 other Foundry customers.  (Dkt. 21 at ¶ 14; Dkt. 30 at ¶ 14).

Foundry asserts that beginning in 2012 and continuing through 2015, it "received numerous complaints about [Plaintiff] from customers, including complaints about timeliness and quality of products."  (Dkt. 21 at ¶ 15).  Plaintiff does not deny that there were customer complaints during this time period but contends that such complaints "were the result of [a] scheme Defendants engaged in with E. Chen ('Chen'), a former employee of [Plaintiff's], to damage[] [Plaintiff's] business relationships with its customers and suppliers."  (Dkt. 30 at ¶ 15).

In October of 2012, Chen told Foundry that Plaintiff was in financial distress and did not have enough money to pay factories.  (Dkt. 21 at ¶ 17; Dkt. 30 at ¶ 17).  Chen then resigned her employment with Plaintiff in 2013.  (Dkt. 21 at ¶ 18; Dkt. 30 at ¶ 18). Defendants contend that in 2014, Chen began operating PINO Industry Co., Ltd.  ("PINO") as a trading company in China.  (Dkt. 21 at ¶ 19).  Plaintiff maintains that PINO was incorporated in July 2015 as a British offshore company and not as a Chinese company. (Dkt. 30 at ¶ 19).  It is undisputed that by mid-2014, Foundry was working with both Plaintiff and PINO.  (Dkt. 21 at ¶ 20; Dkt. 30 at ¶ 20).  Defendants contend that "[b]y 2015, faced with continued delays and quality issues with [Plaintiff], Foundry transitioned all but two of its customers from [Plaintiff] to PINO."  (Dkt. 21 at ¶ 21).  Plaintiff again maintains that any quality issues were a direct result of a scheme between Defendants and Chen. (Dkt. 30 at ¶ 21).

In or about April of 2015, Plaintiff and its president and owner Xiao Su ("Xiao") confronted Defendants about their business with PINO.  (Dkt. 21 at ¶ 22; Dkt. 30 at ¶ 22).  Over the next several months, Plaintiff and Xiao attempted to persuade Foundry to transition its customers back to purchasing from Plaintiff.  (Dkt. 21 at ¶ 22; Dkt. 30 at ¶ 22).

Plaintiff represents that in July of 2015, it noticed a sharp decline in orders for the year.  (Dkt. 30 at ¶ 39).  Plaintiff states that it investigated the matter and determined that some of its customers were "making purchases from High Hope, the largest and most well-known Chinese trading company in Jiangsu Province."  (*Id*. at ¶ 39).  Plaintiff further claims to have also discovered that certain of its clients were doing business with PINO and states that when it asked Schwartz about PINO, he "dissembled" and repeatedly falsely claimed that the sales downturn was due to "a dip in the economy."  (*Id*. at ¶¶ 40-41).  Defendants further allegedly falsely stated that Ingersoll Rand had recommended another supplier who was taking business away from Plaintiff and denied that any of Plaintiff's former employees were involved in sales to Plaintiff's customers.  (*Id*. at ¶¶ 42-43).

In August of 2015, Foundry advised Plaintiff that it would not bring its major customers back to Plaintiff due to Plaintiff's "poor reputation," but offered to both maintain its current level of ordering and to look for new customers to purchase from Plaintiff.  (Dkt. 21 at ¶ 24; Dkt. 30 at ¶ 24).  Plaintiff rejected this offer and further sent an email to Foundry suggesting that its actions could potentially subject it to criminal sanctions in China.  (Dkt. 21 at ¶ 25; Dkt. 30 at ¶ 25).

Between October of 2015 and February of 2016, Plaintiff sent Foundry several drafts of a proposed "Sales Agency Agreement," which sought to establish an exclusive

sales agency relationship. (Dkt. 21 at ¶ 26; Dkt. 30 at ¶ 26). Foundry ultimately declined to enter in the proposed relationship and did not sign an agreement with Plaintiff. (Dkt. 21 at ¶ 27; Dkt. 30 at ¶ 27).

Xiao's and Schwartz's relationship ended in 2016. (Dkt. 21 at ¶ 28; Dkt. 30 at ¶ 28). Further, Schwartz has not directly communicated with Xiao or anyone else at Plaintiff since 2016. (Dkt. 21 at ¶ 29; Dkt. 30 at ¶ 29). However, Foundry continues to work with Plaintiff "on an operational level to service the orders of the one remaining Foundry client that purchases from [Plaintiff]." (Dkt. 21 at ¶ 30; Dkt. 30 at ¶ 30).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on December 3, 2020. (Dkt. 1). Defendants answered on January 20, 2021, and the matter was referred to United States Magistrate Judge Marian W. Payson for all pretrial matters excluding dispositive motions. (Dkt. 8; Dkt. 9). On February 18, 2021, Judge Payson entered a scheduling order pursuant to which any motions to amend the pleadings were due by April 16, 2021, and fact discovery was to be completed by October 21, 2021. (Dkt. 14). This scheduling order states that no extension of the deadlines set forth therein will be granted "except upon written application, made prior to the cutoff date, showing good cause for the extension." (*Id*. at 4 (emphasis in original)).

Defendants filed the instant motion for summary judgment on April 2, 2021. (Dkt. 18). Plaintiff filed its opposing papers and cross-motion for leave to amend the complaint on May 24, 2021. (Dkt. 29). Defendants filed their reply in further support of the motion for summary judgment and in opposition to the cross-motion to amend on June 21, 2021

(Dkt. 33), and Plaintiff filed its reply in further support of its cross-motion for leave to amend on July 2, 2021 (Dkt. 36).

The fact discovery deadline has been extended to April 27, 2022.  (Dkt. 40).

## DISCUSSION

### I.   Motion for Summary Judgment

#### A.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory

- 7 -

allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).   Rather, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247-48 (1986).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b).  Generally, summary judgment is not appropriate until after some discovery has occurred in a case.  *See Celotex*, 477 U.S. at 322 (holding that the purpose of summary judgment is to allow for disposition of a case "after adequate time for discovery" has elapsed).  However, "where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery."  *Nelson v. Deming*, 140 F. Supp. 3d 248, 257 (W.D.N.Y. 2015) (quotation omitted).

## B.   <u>Viability of Plaintiff's Claims</u>

Plaintiff asserts the following claims in its complaint: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) breach of fiduciary duty; and (5) unjust enrichment. (Dkt. 1 at ¶¶ 56-84).  Defendants seek summary judgment as to each of these claims, arguing that: (1) all of Plaintiff's claims are barred by

New York State's "borrowing statute," New York Civil Practice Law and Rules ("CPLR") 202[1]; (2) Plaintiff's contract-based claims are barred by the New York statute of frauds; (3) Plaintiff has not pled a cognizable injury in connection with its fraud claim; (4) Plaintiff's claim for breach of fiduciary duty is barred by the New York statute of limitations; and (5) Plaintiff's claim for unjust enrichment is impermissibly duplicative. The Court addresses these arguments below.

### 1.    Application of the New York Borrowing Statute

CPLR 202, the New York borrowing statute, provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

"In other words, when a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 31 N.Y.3d 372, 377 (2018) (quotation and alteration omitted). "The primary purpose of CPLR 202 . . . is to prevent forum shopping by a nonresident seeking to take advantage of a more favorable Statute of Limitations in New York." *Antone v. Gen. Motors Corp., Buick Motor Div.*, 64 N.Y.2d 20, 27-28, (1984).

---

[1]    A federal court sitting in diversity applies state substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."). Here, the parties agree that New York law applies.

Defendants argue that the borrowing statute bars Plaintiff's claims in this action "because they would be untimely under the laws of the People's Republic of China, where the alleged claims accrued." (Dkt. 22 at 11). Defendants have submitted in connection with their motion a declaration by Jacques deLisle ("Prof. deLisle"), the Stephen A. Cozen Professor of Law, Professor of Political Science, Director of the Center for the Study of Contemporary China, and Co-Director of the Center for Asian Law at the University of Pennsylvania. (Dkt. 19). Prof. deLisle states that his "research, writing, and teaching for more than thirty years have focused on contemporary Chinese law and Chinese politics and policy." (*Id*. at ¶ 2). Prof. deLisle explains that "[t]he statute of limitations for civil law claims under Chinese law—including contract, tort, unjust enrichment, and other civil claims—is generally three years or, in the case of some claims arising before 2017, two years." (*Id*. at ¶ 2). This period begins to run under Chinese law "when a potential plaintiff knew or should have known that its civil law rights have been infringed." (*Id*. at ¶ 21).

Plaintiff does not dispute that the New York borrowing statute applies to its claims, and further agrees with Defendants that "[p]ursuant to Chinese law, the statute of limitations for breach of contract, fiduciary duty, and unjust enrichment are three years." (Dkt. 29-1 at 13). However, it contends that its claims are nevertheless timely, because "the statute of limitations under Chinese law does not begin to *run* until the plaintiff has sufficient facts to know *both* that it has been damaged and, critically in this case, *who* caused the damage." (*Id*. (emphasis in original)). In support of this position, Plaintiff has submitted two declarations, one from Gen Xie ("Prof. Xie"), a professor of law at the Law School of Nanjing University (Dkt. 29-4), and one from Qinglin Tang, a practicing attorney

- 10 -

in China who represents Plaintiff in its lawsuit commenced in China against Chen (Dkt. 29-5).  Prof. Xie explains that ascertaining when a plaintiff "should have known" that it was damaged and who caused that damage under Chinese law "is highly dependent on the facts of the case, so it is difficult to extract a general judgment benchmark."  (Dkt. 29-4 at ¶ 30).

Defendants do not dispute "that the limitations period accrues and begins to run under Chinese law when the plaintiff knew or should have known that its rights have been infringed and the identity of the alleged infringer."  (Dkt. 33 at 7).  However, they argue that such standard was indisputably satisfied in this case by no later than August of 2015, when Xiao sent an email to Schwartz regarding his suspicions about Defendants' actions. (*See* Dkt. 33 at 7-8).

"In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  Here, the Court relies upon the declarations submitted by the parties and concludes, consistent with the statements of all three experts presented, that (1) the statute of limitations applicable to Plaintiff's claims under Chinese law is three years, and (2) that period runs from when Plaintiff knew or should have known that it had been damaged and by whom.

The Court further finds that, on the record before it, there are genuine issues of material fact as to when Plaintiff knew or should have known that it had allegedly been damaged by Defendants.  Turning first to Plaintiff's claim for breach of contract, it is critical to note that while Plaintiff does allege that it had an exclusive agreement with

Defendants, the breaches alleged in the complaint are <u>not</u> that Defendants were working with other Chinese trading companies.   Instead, the complaint alleges the following "material breaches" of contract by Defendants: (1) unauthorized taking and disclosure of confidential information; (2) conspiring with Chen to steal Plaintiff's customers; and (3) providing Plaintiff with false and misleading information regarding the "state of the business with customers."  (Dkt. 1 at ¶ 59).  While Defendants are correct that the emails they have submitted in connection with their motion establish that Plaintiff knew by August of 2015 that Foundry was not working with Plaintiff on an exclusive basis (*see, e.g.,* Dkt. 18-8 at 2 (email from Schwartz to Xiao dated August 5, 2015, in which Schwartz states that "we cannot go back to [Plaintiff] on an exclusive basis at this time")), these emails are much less clear regarding the specific breaches of contract alleged in the complaint.

Indeed, Defendants' own expert, Prof. deLisle, states only that the facts set forth in the relevant email exchange "<u>likely</u> would be sufficient under Chinese law" to establish that Plaintiff "knew (or at least should have known) that Plaintiff's civil rights had been infringed[.]"  (Dkt. 19 at ¶ 23 (emphasis added)).  But on a motion for summary judgment, the question is not one of likeliness, but of whether a reasonable jury could conclude to the contrary.  Keeping in mind the underdeveloped state of the record at the time Defendants' motion was filed, the Court is not prepared to say at this stage of the proceedings that a reasonable jury would be constrained to find that Plaintiff knew or should have known of the breaches of contract alleged in the complaint in August of 2015.

A similar analysis applies with respect to the claims for fraud, unjust enrichment, and breach of fiduciary duty.  Again, these claims are based specifically on the alleged

scheme between Defendants and Chen to steal Plaintiff's clients, and not on Defendants having engaged in business with other Chinese trading companies. (*See* Dkt. 1 at ¶¶ 69-70, 79-80, 83). The Court cannot find as a matter of law, based on the record before it, that Plaintiff knew or should have known of this alleged wrongdoing more than three years before the complaint was filed. In particular, Plaintiff's contention that both Chen and Defendants repeatedly denied and hid Chen's involvement with PINO is a factual dispute that simply is not amenable to resolution at this stage of the proceedings. The Court accordingly denies Defendants' request for summary judgment based on application of the New York borrowing statute.

<h3 align="center">2.   <u>Application of the Statute of Frauds</u></h3>

Defendants' next argument is that Plaintiff's contract-based claims are barred by the New York statute of frauds, which provides that an unwritten agreement is "void" if "[b]y its terms [it] is not to be performed within one year from the making thereof[.]" N.Y. Gen. Obligation Law § 5-701(a)(1). The statute of frauds operates "to prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 453 (1984). The New York Court of Appeals has long held that "[a] service contract of indefinite duration, in which one party agrees to procure customers or accounts or orders on behalf of the second party, is not by its terms performable within a year—and hence must be in writing . . .—since performance is dependent, not upon the will of the parties to the contract, but upon that of a third party." *Zupan v. Blumberg*, 2 N.Y.2d 547, 550 (1957); *see also Nasso v. Bio Reference Lab'ys, Inc.*, 892 F. Supp. 2d 439, 446 (E.D.N.Y. 2012) (collecting cases).

- 13 -

Plaintiff "does not deny that the statute of frauds is implicated" by its contract-based claims.  (Dkt. 29-1 at 14).  However, it contends that it is excused from compliance with the statute of frauds based on promissory estoppel and equitable estoppel.  (*Id*.).

"Promissory estoppel has . . . become increasingly available to provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds." *Merex A.G. v. Fairchild Weston Sys., Inc*., 29 F.3d 821, 824 (2d Cir. 1994).  When invoked in this context, promissory estoppel is a species of equitable estoppel.  *Id*. at 825.  "To invoke the power that equity possesses to trump the Statute of Frauds, plaintiff must demonstrate 'unconscionable' injury, *i.e.*, injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement."  *Id*. at 826; *see also In re Est. of Hennel*, 29 N.Y.3d 487, 494 (2017) ("[W]here the elements of promissory estoppel are established, and the injury to the party who acted in reliance on the oral promise is so great that enforcement of the statute of frauds would be unconscionable, the promisor should be estopped from reliance on the statute of frauds.").  The standard for establishing unconscionability is "demanding, lest the statute of frauds be rendered a nullity."  *Hennel*, 29 N.Y.3d at 495.

Here, Plaintiff argues that the unconscionability requirement is satisfied because Defendants' actions caused "the effective loss of [Plaintiff's] entire U.S. business."  (Dkt. 29-1 at 16).[2]  However, the specific damages claimed by Plaintiff in this case are: "lost revenue and profits; reputational harm; and lost business opportunities."  (Dkt. 20-3 at 3).

---

[2]    Defendants have not contested the applicability of the other elements of promissory estoppel, so the Court has accordingly only focused on unconscionability.

"Courts have consistently rejected a promissory estoppel exception to the Statute of Frauds when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities, or damage to business reputation." *720 Lex Acquisition LLC v. Guess? Retail, Inc*., No. 09 CIV 7199 DAB, 2011 WL 5039780, at *4 (S.D.N.Y. Oct. 21, 2011) (collecting cases). For example, in *United Mag. Co. v. Curtis Circulation Co*., 279 F. App'x 14 (2d Cir. 2008), the Second Circuit affirmed a district court's grant of summary judgment where the plaintiff claimed promissory estoppel based on the "the loss of money invested in the business over the years" when the defendant allegedly breached an oral agreement to grant an exclusive wholesale territory. *Id*. at 18. Such damages are "precisely the injury that flows naturally from the non-performance of an oral agreement," *id.* (citation omitted), and are therefore not sufficient to constitute an unconscionable injury. The Court accordingly agrees with Defendants that there are no genuine issues of material fact with respect to Plaintiff's contract-based claims; those claims are barred, as a matter of law, by the New York statute of frauds and Defendants are granted summary judgment thereon.

### 3.     Fraud and Cognizable Injury

Defendants next argue that Plaintiff's fraud claim is not viable because Plaintiff has not pleaded a cognizable injury. (Dkt. 22 at 18). Plaintiff does not respond to this argument in its opposition papers.

To establish fraud under New York law, "a plaintiff must show (1) that there was a material, false representation, (2) made with knowledge of its falsity, and (3) an intent to defraud (4) that plaintiff reasonably relies upon, (5) causing the plaintiff damage." *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993). Importantly, as to the last of these

requirements, "New York law awards only 'out-of-pocket' expenses in fraud cases, entitling plaintiffs to damages solely for their actual pecuniary losses," which "must be the direct, immediate, and proximate result of the misrepresentation" and "must also be independent of other causes." *Id.* New York does not recognize lost profits, lost business opportunities, or reputational harm as out-of-pocket expenses. *See Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 143 (2017) ("lost opportunity . . . is not a recoverable out-of-pocket loss"); *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 398 (S.D.N.Y. 2019) ("[I]n applying the out-of-pocket rule, courts have barred recovery for lost profits, loss of customers, and injury to business reputation for fraud and negligent misrepresentation claims.") (citation omitted).

Here, as discussed above, Plaintiff seeks damages for "lost revenue and profits; reputational harm; and lost business opportunities." (Dkt. 20-3 at 3). These damages are not recoverable for fraud, and accordingly, the Court grants Defendants summary judgment on Plaintiff's claim for fraud.

### 4.     Breach of Fiduciary Duty and Equitable Estoppel

Defendants seek summary judgment on Plaintiff's breach of fiduciary duty claim on the basis that it is barred by the New York statute of limitations. It is undisputed that applying the New York statute of limitations, Plaintiff's breach of fiduciary duty claim is subject to a three-year statute of limitations that generally begins to run upon breach. However, Plaintiff argues that there are genuine issues of material fact as to whether the statute of limitations has been tolled by equitable estoppel. (Dkt. 29-1 at 17). The Court agrees, for largely the same reasons discussed above with respect to the statute of

limitations under Chinese law.  In particular, Plaintiff claims that Defendants and Chen actively obfuscated the truth about their activities and that Defendants averred that their actions in seeking out other trading companies was a result of customer demand, when in actuality it was part of a concerted scheme by Defendants and Chen to steal Plaintiff's customers.  On the current record and given the stage of the proceedings, the Court cannot say that a reasonable jury would be unable to credit those claims.

     5.     **<u>Unjust Enrichment</u>**

Finally, the Court turns to Defendants' argument that Plaintiff's unjust enrichment claim is impermissibly duplicative of its claim for breach of an oral contract.  The Court disagrees.  It is true that "under New York law a plaintiff may not escape the statute of frauds by attaching the label 'quantum meruit' or 'unjust enrichment' . . . to the underlying contract claim." *Morgenweck v. Vision Capital Advisors, LLC*, 410 F. App'x 400, 402 n.1 (2d Cir. 2011).  However, Defendants have taken the position that there was no contract at all between the parties, oral or otherwise.  (*See* Dkt. 22 at 16 ("Foundry disputes that any such agreement was ever made.")).  If "there was no contract as an initial matter for the Statute of Frauds to bar, . . . the concern that plaintiffs' unjust enrichment claim may be used to circumvent the Statute of Frauds' one year rule is inapposite." *Speedfit LLC v. Woodway USA, Inc*., 432 F. Supp. 3d 183, 218 (E.D.N.Y. 2020).  Because there is a genuine dispute regarding the existence of the alleged oral contract, it is not impermissibly duplicative for Plaintiff to plead unjust enrichment in the alternative. *See id*.

In sum, and for the reasons discussed at length above, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claims for breach of contract,

breach of the implied covenant of good faith and fair dealing, and fraud, and denies Defendants' motion as to Plaintiff's claims for breach of fiduciary duty and unjust enrichment.

## II.  <u>Motion for Leave to Amend</u>

### A.  <u>Legal Standard</u>

"A district court has broad discretion in determining whether to grant leave to amend[.]" *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000).  Two provisions of the Federal Rules of Civil Procedure guide the Court's analysis of a motion for leave to amend where the deadline for such motions, as set forth in a scheduling order, has passed.[3]  The first is Rule 15(a)(2), which provides that once the time for leave to amend as of right has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The second is Rule 16(b)(4), which provides that a "schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "Where, as here, a scheduling order governs amendments to the complaint, . . . the lenient standard under Rule 15(a), which provides leave to amend shall be freely given, must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause."  *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (quotations and citations omitted).

---

[3]    As set forth above, the deadline in this case to file motions for leave to amend the pleadings was April 16, 2021.  (Dkt. 14).  Plaintiff did not file its motion for leave to amend until May 24, 2021, approximately five weeks after that deadline.

"In determining whether a movant has satisfied the 'good cause' standard under Rule 16(b), 'the primary consideration is whether the moving party can demonstrate diligence.'" *Charter Commc'ns, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 338 F. Supp. 3d 242, 254 (S.D.N.Y. 2018) (quoting *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)).  However, diligence is "not . . . the only consideration.  The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244.

### B.    <u>Lack of Good Cause</u>

Plaintiff has failed to demonstrate good cause for the untimely filing of its motion for leave to amend.  Indeed, Plaintiff failed to acknowledge its late filing or to address Rule 16 in its moving papers, relying solely on "Rule 15's permissive standard and the Second Circuit's liberal precedents for freely allowing motions to amend[.]"  (Dk. 29-1 at 26).  However, when an untimely motion for leave to amend is filed, "[t]he standards of Rule 16(b) must be met first and cannot be short-circuited by an appeal to those of Rule 15(a)." *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 CIV. 1230 (LMM), 2006 WL 2242596, at *3 (S.D.N.Y. Aug. 3, 2006)  (quotation omitted).  Further, Plaintiff has offered no explanation whatsoever for its failure to comply with the scheduling order's clear and unambiguous requirement that any motion for an extension be made prior to the cutoff date.  Notably, Defendants' motion for summary judgment was filed two weeks

before the deadline for filing motions for leave to amend expired, leaving Plaintiff adequate time to seek an extension.

Plaintiff does not address the Rule 16 standard until its reply, and even then there is no attempt to argue that it acted diligently, nor could it reasonably do so.  To the contrary, Plaintiff concedes that it "learned of facts supporting its new claims (at least) in February 2021, but failed to make its motion to amend until after the April 16, 2021 deadline in the Scheduling Order."  (Dkt. 36 at 6).  "A party is not considered to have acted diligently where the proposed amendment is based on information that the party knew, or should have known, in advance of the motion deadline." *Wade v. Kay Jewelers, Inc*., No. 3:17-CV-990 (MPS), 2018 WL 3553340, at *1 (D. Conn. July 24, 2018).

Plaintiff focuses solely on the issue of prejudice in its reply, stating that it missed the Court-ordered deadline "by a mere five weeks" and arguing that "Defendants have not made any argument that they would be prejudiced by allowing the motion to amend."  (Dkt. 36 at 6-7).  However, "the absence of prejudice alone does not constitute good cause under Rule 16." *Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) (affirming denial of motion for leave to amend where the plaintiffs delayed three months in seeking leave to amend after learning facts supporting new cause of action); *see also Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd*., No. 11 CV 726 CBA RLM, 2012 WL 3306612, at *4 (E.D.N.Y. Aug. 13, 2012) ("Although the plaintiffs continue to insist that the filing of an amended complaint would not prejudice the defendants, lack of prejudice alone is typically insufficient to demonstrate 'good cause' under Rule 16[.]").  Further, Defendants "bear[] no burden on this motion—it is plaintiff's burden to show good cause under Rule

16(b)(4)[.]" *Villa v. Sw. Credit Sys., L.P.*, No. 19-CV-01701 JLS JJM, 2020 WL 3808911, at *3 (W.D.N.Y. June 10, 2020) (quotation omitted), *adopted*, 2020 WL 3802936 (W.D.N.Y. July 7, 2020). The fact that Defendants did not identify any particular prejudice in their response to Plaintiff's motion is not dispositive—it was Plaintiff's burden in the first instance to demonstrate good cause.

Plaintiff's reliance on *Perez v. Foremost Ins. Co.*, No. 17-CV-997(HKS), 2020 WL 3316095, at *1 (W.D.N.Y. June 18, 2020), is misplaced. There, certain relevant facts were not discovered by the plaintiff until after the deadline for amending pleadings had already passed. *Id*. at *3. Further, the court in *Perez* expressly noted that "[a] party demonstrates 'good cause' by showing that despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Id*. at *2. *Perez*—an unreported decision from another judge in this District—simply does not contradict the well-established principle that lack of prejudice, standing alone, is insufficient to constitute good cause under Rule 16.

While the Court is reluctant to deny a motion for leave to amend purely on timeliness grounds, Plaintiff's failure to articulate *any facts* supporting a finding of diligence compels that result. Indeed, Plaintiff does not even attempt to demonstrate diligence. Accordingly, a holding to the contrary "would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." *In re Perrigo Co. PLC Sec. Litig.*, No. 19CV70 (DLC), 2021 WL 517441, at *2 (S.D.N.Y. Feb. 10, 2021). The

Court cannot simply ignore Rule 16's good cause requirement and so Plaintiff's untimely motion for leave to amend is denied.

### **CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment (Dkt. 18) as to Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair-dealing, and fraud, and denies Defendants' motion in all other respects. The Court denies Plaintiff's cross-motion for leave to amend the complaint. (Dkt. 29).

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  January 19, 2021
      Rochester, New York