UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NANJING CIC INTERNATIONAL CO., LTD.,

                    Plaintiff,

      v.

JAMES SCHWARTZ, et al.,

                    Defendants.

_____

<u>DECISION & ORDER</u>

20-CV-7031EAW

## <u>PRELIMINARY STATEMENT</u>

Nanjing CIC International Co., Ltd., ("CIC") commenced this action against Foundry Associates, Inc., and its owner and Chief Executive Officer James Schwartz ("Schwartz") (collectively, "defendants") alleging claims for breach of fiduciary duty and unjust enrichment.[1]  (Docket # 1).  Currently pending before this Court is CIC's motion to remove the Attorneys' Eyes Only ("AEO") designation from a summary sales and commission report (the "Sales Report") produced by defendants.[2]  (Docket # 62).  For the reasons discussed below, CIC's motion to de-designate is granted in part and denied in part.

## <u>BACKGROUND</u>

CIC sources, distributes, and sells component parts to manufacturers.  (Docket # 1 at ¶ 8).  According to CIC, in 2003 it retained Foundry as a sales agent to assist in the

---

[1]  The complaint also asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud, but those causes of action were dismissed by the district court.  (Docket ## 1, 41).

[2]  During oral argument, counsel for CIC clarified that its motion does not seek modification of the stipulated protective order.  (*Compare* Docket # 62-20 at 19 ("even if this Court agrees that the documents do not qualify for AEO protection but do still meet the requirements to be made confidential, CIC should be entitled to submit the documents in the Chinese Litigation") *with* 79 at 27-28 ("we're . . . not . . . ask[ing] your Honor to modify the confidentiality order that has already been agreed and executed").

development of customers in the United States.  (*Id.* at ¶ 11).  The gravamen of CIC's complaint

is that Foundry and CIC's former employee E. Chen ("Chen") colluded to steal CIC's U.S.

customer base.  Chen, a resident of China, worked for CIC from 2003 until she resigned in 2013.

(*Id.* at ¶¶ 28, 34).  According to the complaint, following her resignation, Chen, through her own

companies, worked with Foundry to source the component parts for U.S. manufacturers.  (*Id.* at

¶¶ 35-55).  CIC thereafter commenced a lawsuit against Chen in China and the pending lawsuit

against Foundry and Schwartz in the United States.  (*Id.* at ¶ 36).

     As this litigation progressed, the parties exchanged document discovery while

attempting to negotiate a stipulated protective order.[3]  (Docket # 79 at 12, 31).  A dispute arose

in the negotiations concerning whether plaintiff could use documents produced in this litigation

in support of its claims against Chen in the Chinese litigation.  (*See generally* Docket ## 51, 53).

According to CIC, although it had obtained a liability verdict against Chen in that litigation, it

had been unable to establish its actual, rather than statutory, damages because Chen had refused

to produce relevant information regarding her sales.  (Docket # 62-20 at 8).  Both Chen and CIC

have appealed the decision in the Chinese litigation, and CIC wishes to introduce in those

appellate proceedings the sales data produced by defendants in this litigation in order to establish

its actual damages.  (*Id.* at 7-9).

     According to CIC, the initial version of the protective order drafted by defendants

was silent with respect to the use of non-confidential documents in other litigation.  (Docket

## 53 at 2; 53-1).  After CIC expressed its intention to introduce non-confidential documents into

evidence in the Chinese litigation, defendants requested that the draft be amended to include the

following provision:

---

[3]  The parties agreed to abide by a version of the protective order proposed by defendants pending their
negotiations and the Court's resolution of any disputes.  (Docket # 51).

> Nonpublic Discovery Material exchanged by the parties in this
> action, regardless of whether it has been designated as Confidential
> or Attorneys' Eyes Only, shall be used only for purposes of this
> litigation and for no other purposes.

(Docket # 51-1 at ¶ 10).  CIC objected to the proposed change and instead suggested the

following provision:

> Discovery Material designated as Confidential or Attorneys' Eyes
> Only shall be used only for purposes of this litigation and for no
> other purposes.

(*Id.*).

Unable to agree, the parties contacted the Court for assistance.  (Docket ## 51,

53).  At the Court's direction, the parties participated in a conference call with the Court's law

clerk Christin Cornetta, Esq., who provided the parties with the Court's guidance on the dispute

and advised that a formal motion would be required in the event the parties were unable to agree.

On March 28, 2023, the parties jointly submitted a proposed confidentiality stipulation that

contained the language proposed by CIC.  (Docket # 54).  The Court issued the Confidentiality

Stipulation and Order proposed by the parties a few days later (the "Protective Order" or

"Order").  (Docket # 56).

The Protective Order permits a producing party to designate discovery material as

"Confidential" if it contains:

> trade secrets, proprietary business information, competitively
> sensitive information, or other information the disclosure of which,
> in the good-faith judgment of the Designating Party, would be
> detrimental to the conduct of the Designating Party's business or
> the business of any of the Designating Party's customer or clients.

(*Id.* at ¶ 2(a)).  It further permits a party to designate discovery material as "Attorneys' Eyes

Only" if it is:

> of such a private, sensitive, competitive, or proprietary nature that present disclosure to persons other than those [permitted by the Order] would reasonably be expected to cause irreparable harm or materially impair the legitimate competitive position of the Designating Party.  A designation of Discovery Material as Attorneys' Eyes Only constitutes a representation that such Discovery Material has been reviewed by an attorney for the Designating Party and that there is a valid basis for the designation.

(*Id.* at ¶ 2(b)).  In addition, the Protective Order contains a provision delineating the

"anticipate[d]" scope of information permitted to be designated:

> The parties anticipate that "Confidential Information" or information "for Attorneys' Eyes Only" will be limited to names of contacts, contact information, contact person's personality and preferences of communications and business dealings, customized product specifications and other technical requirements, specific business patterns, procurement habits, frequencies and inclinations, pricing preferences, confidential pricing information, information concerning margins, confidential commercial terms of sale, quality control standards, customized and unique requirements for material certification, packaging, and shipping information.

(*Id.* at ¶ 2(c)).

On April 21, 2023, defendants produced the 106-page Sales Report and designated the entire document as AEO.  (Docket ## 62-1 at ¶ 3; 62-2).  According to defendants, the Sales Report contains sales and commissions information "reflecting its business between 2013 and 2022 with" Chen.  (Docket # 68 at ¶ 9).  Specifically, the information in the Sales Report is organized by and presented in monthly tables containing seven different columns reflecting: (1) customer name; (2) invoice number; (3) total invoice amount; (4) amount actually received by Chen's company; (5) Foundry's commission rate for the invoice; (6) the total commission owed to Foundry for the invoice; and (7) notes concerning the invoice.  (Docket ## 62-1 at ¶ 4; 62-2; 68 at ¶ 12).

On July 11, 2023, CIC filed the pending motion challenging the AEO designation of the Sales Report, maintaining that the entire document should be de-designated and permitted to be introduced into evidence in the Chinese litigation.  (Docket # 62).  Defendants opposed the motion, contending that the entire document should retain its AEO designation because it contains "confidential, proprietary, and trade secret information."  (Docket # 68 at ¶ 14).  During oral argument, CIC narrowed its request for de-designation to names of customers that are former CIC customers and the invoiced amounts for those customers, agreeing to the AEO designation for the remaining information.  (Docket # 79 at 19-20 (notes column), 51 (other customers), 54 (commissions)).  Accordingly, the discrete issue before the Court is whether, for those customers that were previously CIC customers, their names and the monthly amounts they were invoiced by and paid to defendants from 2013[4] through 2022 (hereinafter, the "Customer Invoiced Amounts") is information entitled to be designated as either AEO or Confidential under the Protective Order.

## DISCUSSION

Rule 26(c) of the Federal Rules of Civil Procedure provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).  This rule "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 415 (E.D.N.Y. 2007).  It is not

---

[4]  The Sales Report provides information beginning December 2013.  (Docket # 62-2).

uncommon for parties to seek a protective order that delineates general categories of information appropriate for confidentiality protection and permits the parties to designate information as confidential based upon their good faith belief that the produced information falls within those categories and that confidential treatment is warranted. *See generally In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 243 (S.D.N.Y. 2009). Under these protective orders, a "good cause" showing is generally deferred "until a party or intervenor challenges the continued confidential treatment of particular documents," at which point the designating party bears "[t]he burden of establishing good cause" for the protection afforded by the designation. *Id.*; *see also Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 122 (S.D.N.Y.) ("[w]hen a party challenges a [c]onfidential designation, the producing party is obliged to sustain the burden of establishing that good cause existed for continuing confidential treatment") (internal quotations omitted), *reconsidered in part on other grounds*, 2019 WL 5287931 (S.D.N.Y. 2019).

In support of their AEO designation, defendants submitted a declaration from Schwartz that, because it was submitted prior to several concessions by CIC, addresses all of the information contained in the Sales Report, not simply the Customer Invoiced Amounts currently in dispute. (Docket # 68). Schwartz maintains that Foundry considers the information in the Sales Report to be "confidential, proprietary, and trade secret information." (*Id.* at ¶ 14). Schwartz characterizes the Sales Report as a compilation of Foundry's "customer information, order history, purchasing habits, purchasing preferences, as well as specific pricing and shipping information and commercial terms on individual orders." (*Id.*). With such information, Schwartz continues, Foundry's direct competitors, such as CIC, would gain a competitive advantage by learning the identities of the Foundry customers that continued to order parts from China and "the precise ordering history and ordering volume on a customer-by-customer and

invoice-by-invoice basis" (*id.* at ¶ 17); stated another way, they would know who Foundry's

"customers were, how often they were ordering, and approximate sales volume" (*id.* at ¶ 19).

Schwartz acknowledges that invoice information from more recent years (post-2017) presents

greater confidentiality concerns than information from earlier years.  (*Id.* at ¶ 15).  Finally,

Schwartz maintains that de-designation of the Sales Report would be harmful because CIC could

use the information contained in the Sales Report for any purposes, including commercial

purposes such as competition with Foundry for future business in the United States.  (*Id.* at ¶ 17).

   CIC disputes that the information contained in the Sales Report is entitled to any

confidentiality protection.  (Docket ## 62-20; 74).  As an initial matter, CIC maintains that the

information contained in the Sales Report does not qualify for protection under the terms of the

parties' Protective Order because it falls outside the scope of paragraph 2(c), quoted *supra*,

which articulates the parties' anticipated scope of protectible information.  (Docket ## 62-20 at

10-11; 70-8 at 9-11).  With respect to the identity of CIC's former customers, CIC notes that

defendants previously disclosed those customers in interrogatory responses without designating

the information as AEO or Confidential.  (Docket ## 70-4 at ¶ 6; 70-6 at 3-4).  Regarding the

invoice amounts, CIC describes that information as "bare bone[s] summary sales numbers" too

general to offer any competitive advantage.  (Docket # 74 at 4).  Beyond that, according to CIC,

the Sales Report neither identifies the specific products or services purchased, nor provides the

specific quantities purchased.  (*Id.*).  CIC represents that it seeks to use the information only to

litigate this case and to support its actual damages claim in the Chinese litigation.  (*Id.* at 7).

   Examining the language of the Protective Order, I agree with CIC that the

challenged information does not clearly fall within paragraph 2(c).  Although Schwartz in his

declaration asserts that the Sales Report contains customer "order history, purchasing habits, and

purchasing preferences," counsel for defendants conceded at oral argument that Schwartz was simply referring to the fact that the Sales Report discloses the months in which customers were invoiced by Foundry and the amounts of those invoices. (Docket # 79 at 40-42). Because that information is limited to the invoice totals, it does not reveal the specific items purchased, the specific quantities purchased, or the prices of such goods or services. Indeed, counsel for defendants conceded at oral argument that any "pricing information" in the Report is contained only in the notes column, which CIC has agreed may retain its AEO designation. (*Id.*). Accordingly, I agree with CIC that resort to paragraph 2(c) does not resolve the dispute.

Unlike CIC, however, I do not interpret the Protective Order as restricting Confidential or AEO treatment to only the information listed in paragraph 2(c). Significantly, the provision does not state that the parties "agree" that protectible information is limited to the listed information, only that the parties "anticipate" that it will be so limited. Their use of the word "anticipate" rather than "agree" strongly suggests that they intended the list to be a non-exhaustive, illustrative list of the categories of information that both sides envisioned would meet their agreed-upon definitions of AEO and Confidential. Indeed, interpreting paragraph 2(c) to be exhaustive as advocated by CIC would render superfluous the phrase "[t]he parties anticipate that." *See Taylor v. Las Vegas Metro. Police Dep't*, 2019 WL 5839255, *7 n.5 (D. Nev. 2019) ("[t]o interpret the list as exhaustive would render the phrase 'such as' superfluous"), *reconsideration denied by*, 2020 WL 620275 (D. Nev. 2020); *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 331 (E.D.N.Y. 2014) ("[w]here, as here, a court is faced with two interpretations of a contract, courts have avoided adopting an interpretation that renders clauses of the contract meaningless or superfluous") (citing *LaSalle Bank Nat'l Assoc. v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[a]n interpretation of a contract that has the

effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible") (internal quotations omitted)).  In my estimation, the plain language of paragraph 2(c) does not foreclose the possibility that information outside the categories listed in that provision may still be protectible AEO or Confidential information within the terms of the Protective Order.

As defendants correctly note, courts commonly find that sales information is entitled to protection as either AEO or confidential.  *See All Plastic, Inc. v. SamDan LLC*, 2021 WL 2979005, *2 (D. Colo. 2021) ("courts have permitted AEO designations with respect to financial information regarding sales and profits") (collecting cases); *In re Novartis & Par Antitrust Litig.*, 2019 WL 5722055, *10 (E.D. Pa. 2019) ("[a]n analysis of other decisions from federal district courts establishes [that] producing sales documents under [AEO] is not out of the ordinary") (collecting cases); *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*, 2017 WL 4839375, *2 (D. Idaho 2017) ("courts have generally viewed sales data as trade secrets or confidential information"); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2023 WL 196134, *3 (S.D.N.Y.) ("courts in this [d]istrict have permitted the redaction of confidential information such as sales and pricing data on the grounds that its disclosure would work a competitive harm on the disclosing enterprise"), *reconsideration denied by*, 2023 WL 3966703 (S.D.N.Y. 2023).  That said, "decisions regarding the propriety of confidentiality designations are intensely fact-based," *Sprint Nextel Corp. v. Simple Cell Inc.*, 2015 WL 13840324, *4 (D. Md. 2015), and should be guided by the terms of the parties' negotiated Protective Order.  Thus, I turn to the parties' agreed-upon definitions of "AEO" and "Confidential."

9

To qualify as AEO under the Order, information must be "of such a private, sensitive, competitive, or proprietary nature that present disclosure . . . would reasonably be expected to cause irreparable harm or materially impair the legitimate competitive position of [Foundry]."  (Docket # 56 at ¶ 2(b)).  Schwartz represents in his declaration that Foundry considers the information in the Sales Report to be "confidential, proprietary, and trade secret information."  (Docket # 68 at ¶ 14).  He does not, however, describe Foundry's procedures for or methods of protecting this information against disclosure, nor does he indicate whether and the extent to which the information is shared with Foundry employees, customers, or others.  *See U2 Home Ent., Inc. v. KyLin TV, Inc.*, 2008 WL 1771913, *2 (E.D.N.Y. 2008) ("[i]n determining whether purported trade secrets should be protected, the [c]ourt must consider a variety of factors, including the extent to which the information is known both outside the business and to those involved in the business").  Similarly, although he maintains that disclosure of such information would provide a competitive advantage to Foundry's competitors, Schwartz's assertions on this issue are non-specific and conclusory, and unaccompanied by any explanation as to how competitors could actually use the Customer Invoiced Amounts to Foundry's disadvantage.

In their supplemental submission, defendants contend that Foundry would be harmed even if disclosure of the Sales Report were limited to the Customer Invoiced Amounts. (Docket # 73 at 5).  They cite Schwartz's representation that "it would be devastating from a competitive standpoint because [Foundry's] competitors would know exactly who [Foundry's] customers were, how often they were ordering, and approximate sales volumes."  (*Id.* (citing Docket # 68 at ¶ 19)).  Again, however, they fail to explain how competitors could use this information to enhance their competitive position.

10

"An [AEO] designation, which generally limits review of documents to the parties' attorneys and experts, is considered the most restrictive (and thus least often justified) tier of discovery." *Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, 2022 WL 3365069, *3 (W.D. Ky. 2022) (internal quotations omitted). To demonstrate entitlement to AEO treatment, "the disclosing party must provide specific demonstrations of fact, supported where possible by affidavits and concrete examples." *Id.* (internal quotations omitted).

Judged under this standard, Schwartz's assertions of harm from disclosure of the Customer Invoiced Amounts are too conclusory and non-specific to justify AEO designation under the Protective Order. *See NewMarket Corp. v. Innospec Inc.*, 2011 WL 2144695, *4 (E.D. Va. 2011) ("while [p]laintiffs have made general allegations of the harm that will result from the disclosure, they have failed to allege specific facts, through affidavits or otherwise, of any clearly defined injury to its competitive position[;] [t]he good cause requirement contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements") (internal quotations omitted); *Home Fed. Bank of Tenn. v. Home Fed. Bank Corp.*, 2020 WL 12863501, *4 (E.D. Tenn. 2020) ("[w]here the movant is a business seeking protection, it must demonstrate that disclosure would cause significant harm to its competitive and financial position[;] [t]hat showing requires specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm"); *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 133 F. Supp. 3d 1079, 1084 (N.D. Ill. 2015) ("the designating party must show that disclosure will result in a clearly defined and serious injury, by pointing to specific demonstrations of fact[;] . . . [c]onclusory statements – including broad allegations of potential harm or competitive injury – are insufficient to meet the good cause standard") (internal quotations omitted). Specifically,

they fail to demonstrate that disclosure to anyone other than counsel would reasonably be expected to cause "*irreparable harm*" or "*material[] impair[ment]*" to Foundry's competitive position. (Docket # 56 at ¶ 2(a) (emphasis added)). On this record, I find that defendants have failed to demonstrate that the Customer Invoiced Amounts information is entitled to AEO protection under the terms of the Protective Order. *See Tasty One, LLC v. Earth Smarte Water, LLC*, 2023 WL 2434241, *3 (D. Nev. 2023) (finding no good cause to warrant AEO or confidential designation; "when the information predominantly relates to mutual customers of the parties who have already made their respective purchases, the risk of misuse is reduced"); *Sprint Nextel Corp. v. Simple Cell Inc.*, 2015 WL 13840324 at *3-4 (concluding commercial sales including "invoices, purchase orders, and pertinent customer information" not entitled to AEO designation; "[d]efendants have not demonstrated how its pricing strategies in 2011, 2012, and 2013 might be extrapolated to its current pricing strategy"); *Water, Inc. v. Everpure, Inc.*, 2011 WL 13186051, *3 (C.D. Cal. 2011) (concluding financial documents including financial statements, balance sheets, financial summaries, and product sales reports not entitled to AEO designation).

Whether the Customer Invoiced Amounts may be designated as "Confidential" under the terms of the protective order presents a closer question. The order permits Foundry to designate information as "Confidential" if it contains "trade secrets, proprietary business information, competitively sensitive information, or other information the disclosure of which, in the good-faith judgment of [Foundry], would be detrimental to the conduct of [Foundry's] business or the business of [Foundry's] customers or clients." (Docket # 56 at ¶ 2(a)). In contrast to AEO treatment, confidential treatment under the Protective Order does not require a

showing of harm or detriment so long as the designated information consists of "trade secret, proprietary business information, [or] competitively sensitive information."

Although defendants have failed to establish that disclosure of the Customer Invoiced Amounts would cause irreparable harm or material impairment to Foundry's business, Schwartz's declaration supports defendants' contention that the information – at least the more recent sales information – is commercially sensitive.  According to Schwartz, disclosure of the Customer Invoiced Amounts would provide Foundry's competitors with an advantage because they would know the identities of Foundry's customers and the gross monthly volume of Foundry's sales to them (Docket # 68 at ¶ 19), information they could use for competitive purposes, presumably to target potential lucrative customers.

The information that defendants seek to designate spans approximately nine years.  As Schwartz himself appears to acknowledge, there is diminished competitive or commercial sensitivity associated with older, staler invoice information.  (*Id.* at ¶ 15) ("[t]he confidential nature of this information is heightened because . . . most of the Reports relate to sales made since 2017, which reflect more recent customer information and order history than earlier years").  Here, defendants have not shown, nor can the Court appreciate, how years-old customer summary invoice amounts remain commercially sensitive.  *See Tasty One, LLC v. Earth Smarte Water, LLC*, 2023 WL 2434241 at *3 ("[p]laintiff fails to explain how information about three-to six-year-old sales can harm its current market standing"); *In re Syngenta AG MIR 162 Corn Litig.*, 2020 WL 1303967, *3 (D. Kan. 2020) ("all of the business information is already many years old, and plaintiff has not shown that any particular information is not stale and that plaintiff would likely still be harmed by disclosure"); *Water, Inc. v. Everpure, Inc.*, 2011 WL 13186051 at *2 ("[b]ecause most of the requested information is several years old, it is

unclear how this stale information will cause competitive harm to [plaintiff]"); *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 133 F. Supp. 3d at 1085 ("[defendant] has not explained with any particularity how allowing [plaintiff's] employees to view years-old invoices and specifications could give [plaintiff] any unfair competitive advantage in the current market or lead to unfair leverage over the customers identified in the documents"). On this record, I find that defendants have failed to establish good cause for designating as Confidential Customer Invoiced Amounts before 2018.

I reach a different conclusion with respect to the more recent Customer Invoiced Amounts. Defendants have proffered sufficient information to support their contention that recent sales information is commercially and competitively sensitive and have therefore established good cause to designate those Customer Invoiced Amounts as "Confidential."[5] *See Home Fed. Bank of Tenn. v. Home Fed. Bank Corp.*, 2020 WL 12863501 at *10 (holding documents should be redesignated from AEO to confidential); *Sprint Nextel Corp.*, 2015 WL 13840324 at *6 ("[t]he [c]ourt is sensitive to [d]efendants' interests in protecting its commercial information[;] . . . the [c]ourt will direct that [d]efendants change the designation . . . from [AEO] to 'confidential'"); *Glob. Material Techs.*, 133 F. Supp. 3d at 1088 (finding defendant had failed to establish good cause for AEO designation but permitting confidential designation; "this court is sensitive to the need to protect commercial information and agrees that the two groups of documents relevant here should maintain their 'confidential' status under the first tier of the protective order").

---

[5] As articulated during oral argument, the Court makes no finding as to whether defendants would be entitled to sealing of the Sales Report in the event the Report is offered into evidence in support of a dispositive motion or at trial. In addition to the confidentiality concerns of the parties, such a determination would require consideration of the public's right of access to judicial proceedings and the presumption that judicial documents are public. *See Matagrano v. Levitt*, 2023 WL 4206511, *7 (W.D.N.Y. 2023).

Accordingly, defendants are directed to produce a de-designated and redacted version of the Sales Report consistent with this decision and the concessions made by CIC following the filing of the motion.  The de-designated version of the Sales Report should contain information predating 2018 relating to prior CIC customers limited to their names, the invoice number, invoiced amount, and amount received.  Consistent with CIC's representations and concessions, the redacted Sales Report should be marked "For Litigation Only" to reflect CIC's agreement to use the information only (1) in connection with this litigation; and (2) "to submit to the court in China to support its damages claims against [Chen] in the Chinese Litigation." (Docket ## 74 at 7; 79 at 17).  *See Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. at 122 (de-designating documents and permitting the documents to be submitted to foreign court in connection with request for deposition of foreign witness); *Water, Inc.*, 2011 WL 13186051 at *2 & n.3 ("although de-designation of the disputed documents will allow [defendant's] employees to access the information therein, the documents will remain confidential and any act by [defendant] to 'leak' the information or otherwise use it for a non-litigation purpose will result in a violation of the [p]rotective [o]rder").

## **CONCLUSION**

For the reasons stated above, CIC's motion to de-designate the Sales Report **(Docket # 62)** is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
        October 20, 2023